**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**AT ELKINS**

| | |
|---|---|
| **M & M POULTRY, INC.** | |
| **Plaintiff,** | |
| **vs.** | **CIVIL ACTION NO. 2:15 cv 32 (Bailey)** |
| **PILGRIM'S PRIDE CORPORATION** | |
| **Defendant.** | |

### PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

KEITH LIVELY (WV Bar #8919)
**Doyle Barlow & Mazard, PLLC**
1110 Vermont Ave., N.W., Suite 715
Washington, District of Columbia 20005
202.589.1834 (tel)
202.589.1819 (fax)
klively@dbmlawgroup.com

J. DUDLEY BUTLER (MS Bar #7626)
**Butler Farm & Ranch Law Group, PLLC**
*Admitted Pro Hac Vice*
499-A Breakwater Dr
Benton, Mississippi 39039
(662) 673-0091 (tel)
(662) 673-0091 (fax)
jdb@farmandranchlaw.com

TODD JOHNSON (WV Bar #9261)
**Johnson Law, PLLC**
P.O. Box 519
Morgantown, West Virginia 26507
(304) 292-7933 (tel)
(304) 292-7931 (fax)
todd@jlawpllc.com

*ATTORNEYS FOR PLAINTIFF*
*M & M POULTRY, INC.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES………………………………………………………..iii

INTRODUCTION…………………………………………………………………...1

LEGAL STANDARD FOR MOTION TO DISMISS………………………………4

ARGUMENT ……………………………………………………………………...5

I.   THE PSA IS NOT AN ANTITRUST STATUTE AND ALLEGATIONS OF
     ANTICOMPETITIVE INJURY ARE NOT REQUIRED TO PROVE VIOLATIONS
     UNDER THE PSA. (COUNT I)………………………………………………...5

        A.   The Fourth Circuit Does Not Require Plaintiff to Allege Anticompetitive Harm In
             Order To Prove Violations Under the PSA………………………………..……5

        B.   Defendant Intentionally Misleads This Court By Stating That Eight Circuits
             Require Anticompetitive Harm to Prove Claims Under § 192 (a) and (b)……….8

        C.   The Sixth Circuit's Opinion Requiring a Showing of Actual Anticompetitive
             Effect Should Be Rejected Because It Is Derived From a Misinterpretation of The
             Holdings of Seven Other Circuits………………………………………………9

        D.   This Court Must Take a Fresh Look at the PSA in Order to Make an Informed
             Decision on Whether Proof of Competitive Harm is Required to Prove a Claim
             Under § 192(a) and (b)………………………………………………………...10

                i.    Statutory Interpretation Starts With the Plain Language of the Statute….10

                ii.   The Plain Language of the PSA Does Not Require Proof of Competitive
                      Injury To Prove a Claim Under § 192 (a) and (b)………………………..11

                iii.  The PSA is Intended to Provide Broader Protections to Poultry Farmers
                      Than The Antitrust Laws…………………………………………………...13

                iv.   *Chevron* Deference Should be Given to the USDA's Long-Standing
                      Assertion that Competitive Injury is not Required Under §192 (a) and (b)
                      of the PSA……………………………………………………………...16

        E.   Plaintiff's Complaint Contains Sufficient Allegations to Prove Likelihood of
             Competitive Injury…………………………………………………………….20

II.  PLAINTIFF PROPERLY ALLEGED A BREACH OF CONTRACT CLAIM UNDER
     WEST VIRGINIA LAW.  (COUNT II)……………………………………………22

III.   PLAINTIFF PROPERLY ALLEGED A CLAIM FOR BREACH OF COVENANT OF
       GOOD FAITH AND FAIR DEALING UNDER WEST VIRGINIA LAW. (COUNT
       III)…………………………………………………………………………..23

IV.    PLAINTIFF PROPERLY ALLEGED A CLAIM OF TORTIOUS INTERFERENCE
       WITH CONTRACT UNDER WEST VIRGINIA LAW. (COUNT IV)………………...24

CONCLUSION…………………………………………………………………………..25

# TABLE OF AUTHORITIES

**Page(s)**

## CASE LAW

*Armour and Company v. United States*, 402 F.2d 712 (7th Cir. 1968)…………………………...8, 9

*Bates v. United States*, 522 U.S. 23 (1997)……………………………………………………10

*Been v. O.K. Indus., Inc.*, 495 F.3d 1217 (10th Cir. 2007)……………………...9, 12, 18, 21, 22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)…………………………………………4, 5

*Bowman v. USDA*, 363 F.2d 81 (5th Cir. 1966)……………………………………………16

*Bruhm's Freezer Meats, Inc. v. USDA*, 438 F.2d 1332 (8th Cir. 1971)…………………………..1

*Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182 (1973)……………………………………....13

*Capitol Packing Co. v. United States*, 350 F.2d 67 (10th Cir. 1965)……………………………...7

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)……………………………………………………………………16, 18

*Collins v. Pond Creek Mining Co.*, 468 F.3d 213 (4th Cir. 2006)………………………………...6

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)…………………………………………10, 11

*De Jong Packing Co. v. U.S. Dep't of Agric.*, 618 F.2d 1329 (9th Cir. 1980)……………………8

*Estate of Coward v. Nicklos Drilling Co.*, 505 U.S. 469 (1992)………………………………...20

*Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*,
    681 F. Supp. 2d 694 (S.D.W. Va. 2009)……………………………………………………22

*Farrow v. United States Dep't of Agriculture*, 760 F.2d 211 (8th Cir. 1985)…………...…..6, 7, 8

*Fieldale Farms Corp. v. London*, 410 F.3d 1295 (11th Cir. 2005)………....…………..9, 12, 18

*FTC v. Motion Picture Adver. Co.*, 344 U.S. 392 (1953)…………………………………………15

*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)………………………………..……...15

*Gerace v. Utica Veal Co.*, 580 F. Supp. 1465 (N.D.N.Y 1984)…………………………………12

*Gilbert v. Residential Funding LLC*, 678 F.3d 271 (4th Cir.2012)………………………….....11

*Hays Livestock Comm'n Co. v. Maly Livestock Comm'n Co.*,
        498 F.2d 925 (10th Cir. 1974)………………………………………………...16

*Highmark West Virginia Inc. v. Jamie*, 655 S.E.2d 509 (W. Va. 2007)…………………………24

*Hoffmaster v. Guiffrida*, 630 F. Supp. 1289 (S.D. W. Va. 1986)…………………………………23

*Hupman v. Cook*, 640 F.2d 497 (4th Cir. 1981)…..………………………………………………...6

*Hyatt v. United States*, 276 F.2d 308 (10th Cir. 1960)……………………………………………13

*IBP, Inc. v. Glickman*, 187 F.3d 974 (8th Cir. 1999)……………………………………………8, 20

*In re Korean Air Lines Disaster*,
        829 F.2d 1171 (D.C.Cir.1987),  *aff'd*, 490 U.S. 122 (1989)………………………………9

*In re Ozark County Cattle Co.*, 49 Agric. Dec. 336 (1990)………………………………………...20

*In re Rowe*, 750 F.3d 392 (4th Cir. 2014)…………………………………………………………11

*In re Walti, Schilling Co.*, 39 Agric. Dec. 119 (1978)……………………………………………...20

*Kinkaid v. John Morrell & Co.*, 321 F.Supp.2d 1090 (N.D. Iowa 2004)…………………………...7

*Knapp v. American General Finance, Inc.*,
        111 F. Supp. 2d 758 (S.D. W. Va. 2000)…………………………………………………...23

*Krieger v. Fadely*, 211 F.3d 134 (D.C. Cir. 2000)…..……………………………………………...4

*Lamie v. U.S. Trustee*, 540 U.S. 526 (2004)………………………………………………………10

*Leiba v. Holder*, 699 F.3d 346 (4th Cir. 2012)……………………………………………………12

*Mallas v. United States*, 993 F.2d 1111 (4th Cir. 1993)……………………………………….....12

*Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*,
        2009 WL 875553 (E.D.N.Y. March 30, 2009)……………………………………………12

*Neitzke v. Williams*, 490 U.S. 319 (1989)…………………………………………………….....5

*Parchman v. U.S. Dept. of Agriculture*, 852 F.2d 858 (6th Cir. 1988)……………………………6

*Parker Livestock, LLC, v Oklahoma National Stock Yards Company, et al.*,
        590 Fed.Appx. 737 (10th Cir. 2014)………………………………………………17, 18

iv

*Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003)…………………………………………………..4

*Philson v. Goldsboro Milling Co.*,
    1998 WL 709324 (4th Cir. Oct. 5, 1998) (unpublished table decision)…………….6, 7, 8

*Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272 (11th Cir. 2005)……………………………12

*Russello v. United States*, 464 U.S. 16 (1983)……………………………………………...……12

*Safeway Stores v. Freeman*, 369 F.2d 952 (D.C. Cir. 1966)………………………………………...1

*Schumacher v. Tyson Fresh Meats, Inc.*, 434 F.Supp.2d 748 (D.S.D. 2006)……………7, 8, 12

*Spencer Livestock Comm'n Co. v. USDA*, 841 F.2d 1451 (9th Cir. 1988)……………………….13

*Spoor v. PHH Mortg. Corp.*, 2011 WL 883666 (N.D.W.Va., 2011)……………………………23

*Stafford v. Wallace*, 258 U.S. 495 (1922)………………………………………1, 6, 13, 22

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
    373 F. Supp. 2d 631 (S.D. W. Va. 2005)…………………………………………………...24

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)………………………………………………….4

*Swift & Co. v. United States*, 393 F.2d 247 (7th Cir. 1968)……………….…………………1, 15

*Terry v. Tyson Farms, Inc.*, 604 F.3d 272 (6th Cir. 2010)…………………………………….9, 10

*Torbett v Wheeling Dollar Savings & Trust Co.*,
    314 S.E.2d 166 (W. Va. 1983)…………………………………………………………...24

*United States v. Bly*, 510 F.3d 453 (4th Cir. 2007)…………………………………………….11

*United States v. Donahue Bros.*, 59 F.2d 1019 (8th Cir. 1932)…………………………………13

*United States v. Haun*, 124 F.3d 745 (6th Cir. 1997)……………………………………………18

*United States v. Lemon*, 777 F.3d 170 (4th Cir. 2015)…………………………………………….6

*United States v. Mead Corp.*, 533 U.S. 218 (2001).......................................................16, 17, 18

*Van Wyk v. Bergland*, 570 F.2d 701 (8th Cir. 1978)………………………………..………13, 16

*W. Va. CWP Fund v. Bender*, 782 F.3d 129 (4th Cir. 2015)……………………………………16

*Wilson & Co. v. Benson*, 286 F.2d 891 (7th Cir. 1961)………………………………….……...7, 14

*Wheeler v. Newport News Shipbuilding*, 637 F.3d 280 (4th Cir. 2011)……………………………20

*Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355 (5th Cir. 2009)………………...………8, 9, 12

*White v. Pilgrim's Pride Corp.*,
    2008 WL 4471656 (E.D. Tex. Sept. 29, 2008)……………………………………………12

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)……………………………………....12

*Wittenberg v. Wells Fargo Bank, N.A.*,
    852 F. Supp. 2d 731 (N.D.W. Va. 2012)……………………………..……………………22

## STATUTES

7 C.F.R. § 201.100……………………………………………………....……19

7 C.F.R. § 201.100(h)…………………………………………………………23

7 C.F.R  § 201.215……………………………………………………………23

7 C.F.R  § 201.217……………………………………………………………19

7 C.F.R  § 201.218……………………………………………………………19

7 U.S.C. § 192……………………………………………………………*passim*

7 U.S.C. § 193………………………………………………………………16, 18

7 U.S.C. § 197(c)………………………………………………………………2

7 U.S.C. §§ 205-208………………………………………………………....17

7 U.S.C. § 209(b)………………………………………………………………1

7 U.S.C. § 210……………………………………………………………….17

7 U.S.C. § 213(a)…………………………………………………………....17

7 U.S.C. § 213(b)………..…………………………………………………....16, 17

7 U.S.C. § 222……………………………………………………………….15

7 U.S.C. § 224……………………………………………………………….16

7 U.S.C. § 225……………………………………………………………….1

7 U.S.C. § 228……………………………………………………………………...18

7 U.S.C. § 228b……………………………………………………………….……...8

7 U.S.C. § 228b-1…………………………………………………………………..8, 18

7 U.S.C. § 228b-2……………………………………………………………………19

7 U.S.C. § 228b-3……………………………………………………………………19

7 U.S.C. § 228b-4……………………………………………………………………19

15 U.S.C. § 45……………………………………………..………………………..9, 15

15 U.S.C. § 45(a)(1)………………………………………………………………...14

## **RULES**

Fed. R. Civ. P. 8…………………………………..…………………………………4

Fed. R. Civ. P. 8(a)(2)………………………………………………………………..5

Fed. R. Civ. P. 12(b)(6)……………………………………………………………….5

## **OTHER AUTHORITIES**

1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981)……………………………...17

61 Cong. Rec. 1805 (1921)…………………………………………………………15

H.R. REP. No. 85-1048 (1957), *reprinted in* 1958 U.S.C.C.A.N 5213………………………2, 21

Implementation of Regulations Required Under Title XI of the Food, Conservation and Energy Act of 2008; Conduct in Violation of the Act, 75 Fed. Reg. 119 (June 22, 2010). *Federal Register: The Daily Journal of the United States………………………………………………………*..19

Packers and Stockyards Act of 1921…………………………………………………..*passim*

USDA Amicus Brief filed in *London v. Fieldale Farms Corp.*, 410 F.3d 1295 (11th Cir. 2005)………………………………………………………………………………...17

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff M&M Poultry, Inc. ("M&M") respectfully submits this Opposition to Defendant's Motions to Dismiss on behalf of Pilgrim's Pride Corporation ("Pilgrims" or "Defendant").  Through a series of detailed fact based allegations set forth in 17 pages and 53 paragraphs, M&M properly alleged all of its federal and state claims.  Defendant's Motion to Dismiss should be denied and this litigation should proceed.

## INTRODUCTION

Defendant misleads the Court as to both the law and facts of this case.  From its false statement that the Packers and Stockyard's Act ("PSA") is an antitrust statute and nothing more, to its assertion that it could suspend delivery of chicks practically at any time it so chose, Defendant ignores its own obligations to M&M under both the law and the terms of the most recent Broiler Production Agreement dated February 24, 2012 ("BPA"; Attached as Exhibit 1).  Defendant erroneously argues that M&M's claims under the PSA should be dismissed because they require a showing of competitive harm and further argues that M&M's state law claims are unsupported by the documents and nonsensical.  Defendant's assertions are exaggerated and untrue.  First, the PSA is not an antitrust statute.[1]  The PSA is a remedial statute and courts have held that it should be liberally construed and that it is broader than predecessor antitrust legislation found in Sherman, Clayton, Robinson-Patman, and Federal Trade Commission ("FTC") Acts.[2]  Moreover, Section 202 of the PSA (7 U.S.C. § 192) was intended to provide additional protection to poultry farmers from

---

[1] The PSA is intended to provide remedies in addition to those provided under antitrust statutes and does not supplant them. 7 U.S.C. § 209(b) (private right of action under PSA "shall not in any way abridge or alter remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies"); 7 U.S.C. § 225 (providing that nothing in PSA is intended to "prevent or interfere" with the enforcement of, among other things, the Sherman Act or Clayton Act.)

[2] *Stafford v. Wallace*, 258 U.S. 495, 521 (1922); *Bruhm's Freezer Meats, Inc. v. USDA*, 438 F.2d 1332, 1336 (8th Cir. 1971); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968); *Safeway Stores v. Freeman*, 369 F.2d 952, 956 (D.C. Cir. 1966).

live poultry dealers engaging in unfair, deceptive, and unjustly discriminatory practices separate from basic antitrust law, which already existed when the PSA was enacted.[3]  Second, Plaintiff properly alleged the state law claims.

This case involves a poultry grower who worked his family's chicken farm for over forty years and is now in danger of losing it all due to the unfair, deceptive and unjustly discriminatory actions of Defendant, as well as being subjected to undue and unreasonable prejudice and disadvantage by the Defendant.

In 2009, David Mongold, on behalf of his company M&M, entered into a poultry growing arrangement with Defendant by signing a standard BPA. (Am. Compl. ¶ 6).  M&M refers to this agreement as standard because at no time was Mr. Mongold able to negotiate its terms, save for M&M's right to refuse the BPA's arbitration clause, a right recently granted to poultry growers by Section 210 of the PSA (7 U.S.C. § 197(c)) and set forth in the most recent BPA signed in February 2012.  *See* Exhibit 1.  The BPA is always a take-it-or-leave-it contract drafted solely by Defendant.  (Am. Compl. ¶¶ 8, 10).  However, in this case that point cannot be overly emphasized because Defendant is the only poultry processor in the area, which means that it holds all the leverage against the growers.  (*Id.* at ¶ 11).

Under this arrangement, Defendant controls absolutely every detail of the operation, but made M&M solely responsible for the cost of its chicken houses and equipment, which amounted to hundreds of thousands of dollars.  (*Id.* at ¶ 8).  M&M incurred significant debt in reliance on the BPA, fronting the cost for equipment, utilities, and maintenance.  (*Id.* at ¶ 7).  Defendant provided M&M with flocks of chickens and proprietary feed.  Defendant controlled the quality of the chickens and the quality of the feed provided to M&M.  (*Id.* at ¶ 8).

---

[3] H.R. REP. No. 85-1048 (1957), *reprinted in* 1958 U.S.C.C.A.N 5212.

Despite controlling virtually every aspect of M&M's operation except for the debt, Defendant sought to exert even more pressure.  (*Id*).  With no objectively reasonable justification, Defendant demanded that M&M allow unilateral access between Defendant and Grant County Bank, who held the mortgage on the farm, where Mr. Mongold and his family live, and also to allow unilateral access to M&M's utility providers.  (*Id*. at ¶¶ 25, 52).  M&M was forced to borrow against its mortgage in order to fund a utilities "escrow" account, which was completely unnecessary.  (*Id*. at ¶¶ 25, 35 and 52).  At the time Defendant demanded this intrusive and unnecessary access, it had no legitimate reason to do so.  (*Id*. at ¶ 52).  M&M was not behind on its mortgage and never allowed the utilities to lapse.  (*Id*).  M&M, in fact, owned an industrial backup generator on the farm to ensure against power outages.  (*Id*. at ¶ 33).  Other growers were not put under similar restrictions.  (*Id*)

Despite these facts, Defendant not only demanded these concessions but also sought to impose them as new terms of the agreement.  When Grant County Bank closed the escrow account, Defendant pretended that the closure of the account, which was never a material term or requirement of the BPA, was a breach of the BPA.  (*Id*. at ¶ 52).  Defendant's self serving letters dated May 28, 2014 and June 6th, 2014 attached to its motion to dismiss do nothing more than evidence its pressure tactics.  (Defendant's Motion to Dismiss ("MTD") at p. 8; Exhibits 2-3 to MTD;[4] Am. Compl.  ¶¶ 28, 29 and 31).  Despite their ominous tones, no letter to Mr. Mongold ever states that the electricity was cut off, because it never was.  Defendant had no justification for hounding M&M about its utilities for years when the utilities were always paid and never shut off.  (Am. Compl. at ¶ 31).

---

[4] These letters are inappropriately attached to Defendant's Motion to Dismiss and should not be considered.  M&M disputes the statements made in these self-serving letters.

Defendant condescendingly casts aspersions on Mr. Mongold's abilities to run his "personal finances". (MTD at p. 8, Exhibit 2 to MTD). Such condescension is typical of the treatment Plaintiff received throughout its association with Defendant. It is also the height of hypocrisy for Defendant to criticize M&M's financial management practices when Defendant's own financial mismanagement led to its very public bankruptcy and the closure of numerous facilities and the ruination of hundreds of chicken growers throughout the country.[5] Consequently, taxpayers were left to pick up the tab caused by the inept and irresponsible actions of Defendant that caused this economic calamity.[6]

## LEGAL STANDARD FOR MOTION TO DISMISS

A complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8. "Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense to define more narrowly the disputed facts and issues." *Id.* at 47-48. It is not necessary for the plaintiff to plead all elements of his *prima facie* case in the complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002), or "plead law or match facts to every

---

[5] Eric Morath, *Bankruptcies Hit Arkansas 'Boomtown'*, The Wall Street Journal, January 28, 2010, *available at* http://blogs.wsj.com/bankruptcy/2010/01/28/bankruptcies-hit-arkansas-boomtown/ (Pilgrims closes Arkansas plant upon which 200 growers relied); Bob Burgdorfer, *Pilgrim's files for bankruptcy, weighs on rivals*, Reuters, December 1, 2008, *available at* http://www.reuters.com/article/2008/12/02/us-pilgrims-bankruptcy-idUSTRE4B05QU20081201 (Pilgrims' bankruptcy caused in part by hedging of feed prices and debt from acquisition of 2006 acquisition of Gold Kist, Inc.); Amanda Jones Hoyle, *Siler City leaders see little hope for Pilgrim's Pride plant*, Triangle Business Journal, July 9, 2009, *available at* http://www.bizjournals.com/triangle/stories/2009/07/13/story10.html. (Attached as Exhibit 2).

[6] Poultry Loss Contract Grant Assistance Program Fact Sheet, Sep. 2010 published by U.S.D.A ($60 million in federal assistance to farmers victimized by Pilgrim's bankruptcy);
Kimberly Quillen, *Foster Farms completes acquisition of former Pilgrim's Pride chicken plant in Farmerville*, The Times-Picayune, May 22, 2009, *available at*
http://blog.nola.com/tpmoney/2009/05/foster_farms_completes_acquisi.html (State of Louisiana contributed $50 million in assistance for purchase of idled plant). (Attached as Exhibit 3).

4

element of a legal theory." *Peters v. Jenney*, 327 F.3d 307, 322 (4th Cir. 2003) (citing to *Krieger v. Fadely*, 211 F.3d 134, 137 (D.C. Cir. 2000)).  The plaintiff must allege a "plausible entitlement to relief," by setting forth facts consistent with the allegations.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  While these facts must "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" a complaint "does not need detailed factual allegations."  *Id.* at 545.  In fact, Justice Souter succinctly articulated the pleading standard required under *Twombly*:  "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570.

The Supreme Court in *Twombly* reiterated that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* at 555; Fed. R. Civ. P. 8(a)(2).  A court must not dismiss a complaint for failure to state a claim unless the plaintiff failed to plead "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Claims shall not be dismissed simply because someone may not believe the allegations or feels that recovery is remote or unlikely. *See id.* at 556 ("a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations").  Regardless of whether Defendant agrees with the allegations against it, there is no doubt that the claims have been properly pled.

## ARGUMENT

I.   **THE PSA IS NOT AN ANTITRUST STATUTE AND ALLEGATIONS OF ANTICOMPETITIVE INJURY ARE NOT REQUIRED TO PROVE VIOLATIONS UNDER THE PSA. (COUNT I)**

    A.   **The Fourth Circuit Does Not Require Plaintiff to Allege Anticompetitive Harm In Order To Prove Violations Under the PSA.**

5

Defendant erroneously asserts that the PSA is an antitrust statute and that the law of the Fourth Circuit requires anticompetitive effect as a prerequisite to any claim under 7 U.S.C. § 192 (a) or (b).  (MTD at 2 and 12).  However, the Supreme Court and the Fourth Circuit never held that the PSA is an antitrust statute or that a showing of anticompetitive harm is necessary to prove violations under the PSA.[7]  Defendant's reliance on a single unpublished Fourth Circuit case for this proposition is a gross mischaracterization of the law, a misrepresentation of what the case actually holds, and undeniably flawed.  *Philson v. Goldsboro Milling Co.,* 1998 WL 709324 (4th Cir. Oct. 5, 1998) (unpublished table decision) (Attached as Exhibit 4).[8]  As this Court is aware, in the Fourth Circuit, unpublished cases "have no precedential value."  *United States v. Lemon*, 777 F.3d 170, 175 n.3 (4th Cir. 2015).

Even where unpublished opinions are considered, they are "entitled only to the weight they generate by the persuasiveness of their reasoning."  *Collins v. Pond Creek Mining Co.,* 468 F.3d 213, 219 (4th Cir. 2006) (quoting *Hupman v. Cook*, 640 F.2d 497, 501, n.7 (4th Cir. 1981)).  Here, the *Philson* case offers no reasoning for its holding.  *Philson* merely upheld a jury instruction stating that a Plaintiff bringing a claim under §192(a) was "required to prove that the defendants' conduct was likely to affect competition adversely in order to prevail."  *Philson* at *4.[9]  With no independent analysis, the *Philson* court merely cited an Eighth Circuit decision, *Farrow v. United States Dep't of Agric.,* 760 F.2d 211, 215 (8th Cir. 1985), and a Sixth Circuit decision that also relied on the *Farrow* decision.  *Parchman v. U.S. Dept. of Agri.*, 852 F.2d 858,

---

[7] To support its contention that the PSA is an antitrust statute, Defendant cites *Stafford*, 258 U.S. 495. However, *Stafford* usually is cited for the proposition that the PSA is remedial legislation that should be liberally construed.  *Id*. at 521.

[8] Defendant cites the *Philson* decision in full on page 2 and n. 2 of its MTD, but conveniently fails to note that the decision is unpublished.

[9] Even if *Philson* carries any value, the holding does not stand for the Defendant's proposition that the PSA is an antitrust statute or that proof of competitive harm is necessary.  Rather, the *Philson* decision at best holds that the PSA requires a lower standard of proof than an antitrust claim.

864 (6th Cir. 1988).  There is no independent reasoning in the unpublished *Philson* decision

except for its reliance on *Farrow.*  This lack of reasoning in and of itself should preclude this

Court from relying on *Philson.*

      Furthermore, a close examination of *Farrow* confirms that the *Philson* court mistakenly

interpreted *Farrow* to stand for the proposition that the likelihood of anticompetitive effect *must*

be shown in order to prevail under §192(a).  At least two subsequent district court decisions in

the Eighth Circuit specifically rejected that flawed reading of *Farrow*.

      First, the Northern District of Iowa, found "that only a strained reading of the statute

could require that practices that are 'unfair' or 'deceptive' within the meaning of § 192(a) must

also be 'monopolistic' or 'anticompetitive' to be prohibited."  *Kinkaid v. John Morrell & Co.,*

321 F.Supp.2d 1090, 1103 (N.D. Iowa, 2004) (citing *Wilson & Co. v. Benson*, 286 F.2d 891, 895

(7th Cir. 1961)).  Relying on the *Farrow* decision, the *Kinkaid* court found that because the PSA

is "remedial legislation," it must be liberally construed.  *Kinkaid*, 321 F.Supp.2d at 1103 (quoting

*Farrow,* 760 F.2d at 214).

      Second, a district court in South Dakota held that §192(a) "does not prohibit only those

unfair and deceptive practices which adversely affect competition."  *Schumacher v. Tyson Fresh*

*Meats, Inc.*, 434 F.Supp.2d 748, 754 (D.S.D. 2006).  "The terms 'unfair, unjustly discriminatory,

or deceptive practice or device,'" as used in the PSA "are not defined, and their meaning must be

determined by the facts of each case within the purposes of the Packers and Stockyards Act."  *Id.*

at 753-54 (quoting *Capitol Packing Co. v. United States*, 350 F.2d 67, 76 (10th Cir. 1965)).

      Accordingly, the Fourth Circuit does not require a Plaintiff to show anticompetitive harm

to prove a violation of §192 (a) and (b) of the PSA because:  (1) *Philson*, an unpublished table

decision, is not precedent in the Fourth Circuit; (2) to the extent that *Philson* is of any value,

*Philson* specifically holds that a Plaintiff only needs to show that anticompetitive harm is likely, which is a lower standard than an antitrust case, in order to prove a violation of a PSA claim; (3) *Philson* does not provide any independent analysis regarding its holding; and (4) *Philson* misread the Farrow decision.[10]

**B.      Defendant Intentionally Misleads This Court By Stating That Eight Circuits Require Anticompetitive Harm to Prove Claims Under § 192 (a) and (b).**

Defendant intentionally misleads this Court by presenting it with a whitewash of the law to support its overly broad contention that competitive injury must be shown for a Plaintiff to prevail on a claim under § 192 (a) and (b).  Defendant mischaracterizes the law when it asserts that "eight circuits decided that PSA § 192 (a) and (b) require an anticompetitive effect."  (MTD at 12).  As previously demonstrated herein, the Fourth and Eighth Circuits have not held that an actual anticompetitive effect or competitive injury is a requirement under §192 (a) or (b).[11] Moreover, the majority of these courts have not held that an actual showing of competitive injury is required under any circumstance, but at most only a "likelihood" of competitive injury or harm.[12]

Indeed, the Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits only require a showing of evidence that the challenged practice would *likely* result in competitive injury.  *Wheeler v.*

---

[10] This misreading is evidenced clearly by Congress in Section 409 (dealing with livestock) and Section 410 (dealing with poultry) of the PSA (7 U.S.C. § 228b and 228b-1, respectively).  Here Congress declared it an "unfair practice" to delay payment to producers by mere days.  Congress further stated in each of the sections "nothing in this section shall be deemed to limit the meaning of the term 'unfair practice' as used in this Act."  These sections clearly exemplify, as evidenced by use of the word "limit" instead of "lessen," that Congress intended the PSA to deal with remedial matters as well as antitrust issues.

[11] Defendant cites *IBP, Inc. v. Glickman*, 187 F.3d 974 (8th Cir. 1999) as Eighth Circuit precedent instead of *Farrow*.  However, as with *Farrow,* subsequent Eighth Circuit district court holdings specifically reject the interpretation of the case asserted here by Pilgrims.  "*[IBP]* did not hold that the PSA *in toto* is limited to conduct that reduces competition or has the potential to do so."  *Schumacher,* 434 F.Supp.2d at 752.

[12] *Philson* at *11.  Moreover, the language of the PSA demonstrates that competitive harm is not necessary to prove that certain conduct is "unfair".  In Sections 409 and 410 of the PSA, Congress deemed that the delay of payment of the full amount due to a producer is an "unfair practice" (7 U.S.C. § 228b and 228b-1, respectively).  *See supra* n.10.

8

*Pilgrim's Pride Corp.*, 591 F.3d 355, 363 (5th Cir. 2009); *Armour and Company v. United States,* 402 F.2d 712, 722 (7th Cir. 1968); *De Jong Packing Co. v. U.S. Dep't of Agric.,* 618 F.2d 1329, 1336-37 (9th Cir. 1980); *Been v. O.K. Indus., Inc.,* 495 F.3d 1217, 1230 (10th Cir. 2007); *Fieldale Farms Corp. v. London*, 410 F.3d 1295, 1303 (11th Cir. 2005).  The Tenth Circuit explicitly limited its holding to the term "unfair" found in §192 (a) as requiring evidence that the challenged practice would likely result in competitive injury.  *Been*, 495 F.3d at 1230.  The Seventh Circuit in *Armour* acknowledged that the PSA was inherently broader in scope than the traditional antitrust legislation and that §192 (a) "should be read liberally enough to take care of the types of anti-competitive practices properly deemed "unfair" by the FTC (15 U.S.C. § 45) *and also to reach any of the special mischiefs and injuries* inherent in livestock and poultry traffic."  402 F.2d at 722 (emphasis added).  The Fifth Circuit, in an *en banc* panel, held that "to support a claim that a practice violates subsection (a) or (b) of Section 192 of the [PSA] there must be proof of injury, or *likelihood* of injury, to competition."  *Wheeler*, 591 F.3d at 363.

Accordingly, most of the Circuits have not held that proof of actual anticompetitive effect is required to prove claims under the PSA or that the PSA is an antitrust statute.

**C.    The Sixth Circuit's Opinion Requiring a Showing of Actual Anticompetitive Effect Should Be Rejected Because It Is Derived From a Misinterpretation of The Holdings of Seven Other Circuits.**

The Sixth Circuit egregiously abdicated its responsibilities to interpret the statute.  In *Terry v. Tyson Farms, Inc.,* the Sixth Circuit basically regurgitated the *en banc* decision in *Wheeler*, and spent pages emphasizing the importance of agreement between the Circuits.  604 F.3d 272 (6th Cir. 2010).  "Ultimately, [plaintiff] and the USDA would have this court deviate from the course taken by the seven other circuits that have spoken on this issue, thus creating a conflict.  We decline to do so."  *Id.* at 278.  The Sixth Circuit paid lip service to its obligation "to

9

engage independently in reasoned analysis." *Id.* (quoting *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C.Cir.1987), *aff'd,* 490 U.S. 122 (1989)).  The Court inexplicably emphasized the "importance of maintaining harmony among the Circuits on issues of law." *Terry,* 604 F.3d at 278 (internal citations omitted).  However, despite the Sixth Circuit's ardent stance on perpetuating uniformity with the "rationale employed by our sister circuits" that was "well-reasoned and grounded on sound principles of statutory construction," the Court completely disregarded the holdings of the seven Circuits it sought to support.  *Id.* at 279.  *Terry* erroneously stated "all of these courts of appeals unanimously agree that an anticompetitive effect is necessary for an actionable claim under subsections (a) and (b)" when it is strikingly clear that the seven circuits at issue at best may require the *likelihood* of competitive injury only. With a nonexistent basis for its conclusion, the Sixth Circuit came to a determination that was grounded in nothing but flagrant misinterpretation.

Accordingly, the Sixth Circuit opinion is on its own island, misreading the holdings of other circuits.  As such, the Sixth Circuit's holding should be rejected.

**D.** **This Court Must Take a Fresh Look at the PSA in Order to Make an Informed Decision on Whether Proof of Competitive Harm is Required to Prove a Claim Under § 192 (a) and (b).**

Given that there is no Fourth Circuit precedent and considering the split in the Circuits regarding their different approaches of requiring the likelihood of competitive injury to prove a PSA claim, this Court must examine the Plaintiff's claims under the PSA with fresh eyes.

**(i)  Statutory Interpretation Starts With the Plain Language of the Statute.**

The Supreme Court held that courts should enforce the expressed terms of statutes, presume that the legislature says what it means in a statute and "resist reading words or elements

into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997).[13]

The Fourth Circuit held that statutory interpretation begins with the plain meaning of the statute

and starts with "the language of the statute itself." *See In re Rowe,* 750 F.3d 392, 396 (4th Cir.

2014) (citing *Gilbert v. Residential Funding LLC*, 678 F.3d 271, 276 (4th Cir. 2012) (quoting

*United States v. Bly,* 510 F.3d 453, 460 (4th Cir. 2007)).  "We have stated time and again that

courts must presume that a legislature says in a statute what it means and means in a statute what

it says there.  When the words of a statute are unambiguous, then, this first canon is also the last:

'judicial inquiry is complete.'"  *In re Rowe*, 750 F.3d at 396 (quoting *Conn. Nat'l Bank v.

Germain,* 503 U.S. 249, 253–54, (1992)).  The language at issue here from the PSA, 7 U.S.C. §§

192 (a) and (b), is unambiguous and clear, and clearly not an antitrust statute.

### (ii) The Plain Language of the PSA Does Not Require Proof of Competitive Injury To Prove a Claim Under § 192 (a) and (b).

As the purpose of the PSA undoubtedly is broader in scope than the antitrust laws, the

plain language of the PSA clearly delineates those protections that are meant for individuals

regardless of harm to competition, and those that are meant to protect competition.  The first two

subsections of 7 U.S.C. §192 make it unlawful for Defendant to "(a) [e]ngage in or use any

unfair, unjustly discriminatory, or deceptive practice or device; or (b) [m]ake or give any undue

or unreasonable preference or advantage to any particular person or locality in any respect or

subject, any particular person or locality to any undue or unreasonable prejudice or disadvantage

in any respect."  Subsections (a) and (b) make no reference to restraints of commerce, creation of

a monopoly, or the manipulation or control of prices.  In contrast, subsections (c) through (f) of

---

[13] "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  *See also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("It is well established that 'when a statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms.'").

§192 expressly render unlawful conduct that had the tendency, purpose or effect of restraining commerce or creating a monopoly or of manipulating or controlling prices.

"[W]here Congress includes particular language in one section of a statute but omits it in another section of the same [a]ct, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Leiba v. Holder*, 699 F.3d 346, 354 (4th Cir. 2012) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).[14] This reasoning resonated with district courts across the country for many of these same reasons. *See Schumacher*, 434 F. Supp. 2d at 754 ("7 U.S.C. § 192(a)[] does not prohibit only those unfair and deceptive practices which adversely affect competition."); *Gerace v. Utica Veal Co.*, 580 F. Supp. 1465 (N.D.N.Y 1984) (dismissing argument that § 192 (a) required a showing of restraint on trade or competition). Other district courts have expressly rejected the opinions in *Been*, *London*, and *Pickett v. Tyson Fresh Meats, Inc., 420 F.3d 1272 (11th Cir. 2005)*: "if Congress had intended to similarly limit the scope of 192 (a-b) to those acts which adversely affect competition, it could have included that same language therein, but did not." *Milton Abeles, Inc. v. Creekstone Farms Premium Beef, LLC*, 2009 WL 875553, *20 (E.D.N.Y. March 30, 2009); *see also White v. Pilgrim's Pride Corp.*, 2008 WL 4471656 (E.D. Tex. Sep. 29, 2008) (ruling that plaintiff need not prove an adverse effect on competition under §192(a) and (b)).[15]

---

[14] The *Leiba* decision involved interpretation of a federal immigration statute and specifically the statutes use of the term "admitted" in one section of the statute, and "lawfully admitted for permanent residence" in another section of the statute which had distinctive definitions. The Government in *Leiba* argued that for the sake of "congruity" between the two sections, these terms should be given the same meaning. The *Leiba* court rejected this argument and opined that the very fact Congress deliberately chose the different wordings was evidence that the sections were not meant to be congruous. 699 F. 3d at 354.

[15] Moreover, "[Congress] does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). By reading an adverse competitive effect into sections 192 (a)-(b), the other circuits spotted an elephant in this mousehole. The Fourth Circuit agrees, holding that "in the absence of ambiguity, we are not to look beyond the plain wording of the statute or regulation to divine legislative intent." *Mallas v. United States*, 993 F.2d 1111, 1121 (4th Cir. 1993).

Accordingly, the plain language of the PSA does not require proof of anticompetitive

injury or proof of likelihood of competitive injury to prove a claim under § 192 (a) and (b).

### (iii) The PSA is Intended to Provide Broader Protections to Poultry Farmers Than The Antitrust Laws.

If the Court is not satisfied that the language of the PSA is sufficiently plain, it should not

look to antitrust jurisprudence, which has little if nothing to say on the types of prohibitions

found in § 192 (a) and (b).  This Court is better served to consider the Supreme Court's decisions

concerning similar language in the FTC Act, legislative history acknowledging the broader

purpose of the act to extend beyond competitive concerns, and a slew of prior court decisions

finding violations of the PSA where the actions have no apparent effect on competition.  *See*

*Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 183 (1973) ("incorrect weighing of

livestock" violated § 192(a)); *Van Wyk v. Bergland,* 570 F.2d 701, 704 (8th Cir. 1978)

(purchaser's failure to timely pay for livestock could violate the PSA); *Hyatt v. United States,*

276 F.2d 308, 310-12 (10th Cir. 1960) (upholding administrative finding that falsification of

various consignment documents violated the PSA, despite lack of evidence "that any transactions

prejudiced the interests of other consignors," and specifically rejecting contention that an act that

"hurts no one" could not violate the statute).

Indeed, the PSA was enacted in 1921 "to regulate the business of the packers done in

interstate commerce and forbids them to engage in unfair, discriminatory, *or* deceptive practices

in such commerce, *or* to subject any person to unreasonable prejudice therein." *Stafford,* 258

U.S. at 513 (emphasis added).  The PSA was intended to combat unfair and deceptive trade

practices and other evils in addition to monopolization.  *See Spencer Livestock Comm'n Co. v.*

*USDA*, 841 F.2d 1451, 1455 (9th Cir. 1988) (quoting H.R. Rep. No. 85-1048 and noting that the

PSA "was not intended merely to prevent monopolistic practices, but also to protect the livestock

13

market from unfair and deceptive business tactics."); *see also Van Wyk,* 570 F.2d at 704 ("One purpose of the Act is to assure fair trade practices."); *United States v. Donahue Bros.,* 59 F.2d 1019, 1023 (8th Cir. 1932) ("One of the purposes of this act was to protect the owner and shipper of livestock, and to free him from the fear that the channel through which his product passed, through discrimination, exploitation, overreaching, manipulation, or other unfair practices, might not return to him a fair return for his product.").

If the PSA were an antitrust statute, as Pilgrims would have this Court believe, Congress would have had no reason to enact the PSA because the seminal antitrust statutes Sherman and Clayton were already in full force and effect well before 1921.  The PSA was enacted 30 years after the Sherman Act, and another six years after the Clayton Act, due in no small part to the fact that these seminal antitrust statutes were not adequate to protect individual farmers and ranchers from the overreach and duress that large agricultural concerns could bring to bear due to the inherent inequality of their positions.  "Section [192] (a) and (b) was enacted for the purpose of going further than prior legislation in the prohibiting of certain trade practices which Congress considered were not consonant with the public interest."  *Wilson*, 286 F.2d at 895.  To put it simply, the PSA is a remedial statute that should be liberally construed.

That § 192 (a) and (b) are not restricted by antitrust principles is further established by the fact that the terms used are by and large non-existent in Sherman and Clayton.  Similar terms, however, are found in the FTC Act.  A quick summary of how the FTC Act has been interpreted is helpful in determining how § 192 (a) and (b) should be interpreted.  The FTC Act was passed in order to *supplement* previous antitrust laws by prohibiting a broader category of unfair and anticompetitive practices.  *See* 15 U.S.C. § 45(a)(1).[16]  The Supreme Court faced this very issue

---

[16] The exact language used in the FTC Act is:  "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

of whether an adverse effect on competition is required by the FTC Act, rejecting that proposition and holding that the FTC Act "empower[s] the [Federal Trade] Commission to define and proscribe an unfair competitive practice, even though the practice does not infringe either the letter or the spirit of the antitrust laws," and, more specifically, proscribes "practices as unfair or deceptive in their effect upon consumers, ***regardless of their nature or quality as competitive practices or their effect on competition***."  *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239 (1972) (emphasis added).  There is no requirement of effect on competition in the FTC Act because "[t]he point where a method of competition becomes 'unfair' within the meaning of the [FTC] Act will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question."  *FTC v. Motion Picture Adver. Co.*, 344 U.S. 392, 396 (1953).

The PSA was passed several years after the FTC Act, and broadened the scope of protections beyond antitrust concerns even further.  *See Swift*, 393 F.2d at 253 ("statutory prohibitions of Section [192] of the Packers and Stockyards Act are broader and more far-reaching than the Sherman Act or even Section 5 of the Federal Trade Commission Act."); *see also* 61 Cong. Rec. 1805 (1921) (statement of Rep. Anderson) (Act "goes further than" Federal Trade Commission Act's prohibition of unfair methods of competition because it is not limited to injury to competitors).  Most importantly, the PSA cannot be read more narrowly than the FTC Act as the FTC Act actually is incorporated in the PSA.[17]

Accordingly, an examination of case law regarding the intent of the FTC Act and the PSA as well as the legislative history confirms that the PSA is not an antitrust statute and no showing of actual competitive harm is required to find liability under the PSA.

_____

[17] PSA Section 402 (7 U.S.C. § 222) specifically incorporates sections of the FTC Act.  15 U.S.C. § 45.

### iv. *Chevron* Deference Should be Given to the USDA's Long-Standing Assertion that Competitive Injury is not Required Under § 192 (a) and (b) of the PSA.

The United States Department of Agriculture ("USDA") is authorized to enforce the PSA through administrative proceedings[18] or through the United States Department of Justice ("DOJ") in federal court,[19] and therefore its reasonable interpretation of the PSA is entitled to deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . ."); *W. Va. CWP Fund v. Bender,* 782 F.3d 129, 137 (4th Cir. 2015) (In evaluating a regulation promulgated by an executive agency, we apply the principles of deference articulated in *Chevron*).[20]  The Supreme Court further explained that:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001).

---

[18] 7 U.S.C. §§ 193, 213(b).

[19] 7 U.S.C. § 224 (USDA has authority to enforce § 192 (a) against poultry dealers through the DOJ in federal district court.)

[20] *Bowman v. USDA*, 363 F.2d 81, 84 (5th Cir. 1966) (Secretary's consistent interpretation of solvency, undefined in the PSA, should be given "great weight"); *Van Wyk*, 570 F.2d at 705 (according "great deference" to the Secretary's determination that failure to timely pay for livestock is an unfair or deceptive practice or device under the PSA); *Hays Livestock Comm'n Co. v. Maly Livestock Comm'n Co.*, 498 F.2d 925, 930, 931 (10th Cir. 1974) (Secretary's interpretation of unfair or deceptive practices is entitled to "great deference" on review of reparation orders).

16

More recently, the Tenth Circuit held that USDA should have primary jurisdiction over a plaintiff's case even though the plaintiff had a private right of action because the USDA was in a better position to interpret the language of the PSA. *Parker Livestock, LLC, v Oklahoma National Stock Yards Company, et al.,* 590 Fed.Appx. 737 (10th Cir. 2014). In *Parker,* the plaintiff rightfully filed a private action against the defendants under 7 U.S.C.§ 213(a) of the PSA. The district court, however, ordered the case stayed pending a decision by the Secretary of the USDA. *Id.* The district court "considered referral to the Secretary to be appropriate because the PSA fails to define what constitutes an unfair, unjustly discriminatory, or deceptive practice and a determination by the Secretary would 'help promote the uniform definition of the terms'." *Id*. at 739. The plaintiff argued against the stay and pointed to Section 309 (7 U.S.C. § 210) of the PSA as controlling authority because that section gives USDA the authority to adjudicate violations of Sections 304-307 (7 U.S.C. §§ 205-208), but not for Section 312 (7 U.S.C. § 213(b)). *Id*. at 741. Nevertheless, the Tenth Circuit affirmed the lower court's decision. *Id*. at 744.

Under this framework, this court must give deference to the USDA's position that the PSA prohibits all unfair practices, regardless of whether a practice causes competitive injury [21] Undeniably, the USDA "has consistently taken the position that in order to prove that a practice violates the broad prohibitions in §§ [192](a) and (b) . . . of the [PSA], it is not necessary to prove predatory intent, competitive injury, or likelihood of injury." 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981). Despite the USDA's position, the Tenth and Eleventh Circuits afforded the USDA's position little to no deference because they incorrectly interpreted Supreme Court precedent, which affords deference to an agency when "it appears that Congress delegated authority to the agency generally". *Mead*, 522 U.S. at 226-27. The Tenth and

---

[21] USDA Amicus Brief filed in *London v. Fieldale Farms Corp*., 410 F.3d 1295 (11th Cir. 2005).

Eleventh Circuits did so by narrowly construing the PSA in a way that suggests that the USDA does not have authority to adjudicate violations of § 192 by live poultry dealers and had not promulgated a regulation applicable to the practices the growers alleged violated § 192(a) at the time. *Been*, 495 F.3d at 1297; *London,* 410 F.3d at 1304.

This Court must reject *Been* and *London* because *Been* and *London* did not apply the Supreme Court's opinion in *Mead* correctly and narrowly interpreted the language of the PSA to afford little to no deference to the USDA's position.[22] The Court also should reject *Been* and *London* because the landscape changed considerably. This Court should consider the *Parker* and *Haun* decisions that suggest that deference should be afforded to the USDA. *United States v. Haun*, 124 F.3d 745 (6th Cir. 1997) (holding that USDA through the DOJ can seek monetary penalties under Section 203 of the PSA (7 U.S.C. § 193) even though the USDA could not pursue penalties administratively). In essence, the USDA is afforded deference whether it has administrative authority or not because the USDA is capable of enforcing the PSA through district court litigation.

Under *Mead*, the USDA's interpretation of 7 U.S.C. § 192 must be afforded deference because the USDA has authority to enforce the PSA through administrative proceedings and federal district court litigation as well as to promulgate regulations under the PSA. Indeed, the USDA adjudicates claims for violations of Section 410 of the PSA (7 U.S.C. §228b-1) by live poultry dealers, which deals with "unfair practices" just like 7 U.S.C. § 192. While the USDA does not adjudicate violations of § 192 by live poultry dealers through administrative proceedings, the USDA may enforce this section against live poultry dealers in federal courts

---

[22] By not affording *Chevron* deference where it should have been afforded, it resulted in a perverted interpretation of the law thereby writing antitrust standards into § 192 (a) and (b). This result manipulates the standard in favor of processors who hold a disproportionate share of power in the broiler market and gives them free reign to engage in unfair contracting practices as long as they do not affect competition.

and adjudicates violations of the same section by packers and swine contractors.  *See* 7 U.S.C. §

192 (a).  The Secretary also has rulemaking authority under Section 407 of PSA (7 U.S.C. § 228).

The USDA has administrative authority to promulgate regulations related to poultry and

exercises it on a regular basis through the procedures provided in Sections 411, 412 and 413 (7

U.S.C. §§ 228b-2, 228b-3, and 228b-4, respectively).  In fact, since the *Been* and *London*

decisions, the USDA passed such regulations.  In 2009, the USDA promulgated regulation §

201.100, which provided that packers must provide poultry growers and sellers with certain

records.  In 2011, the USDA promulgated certain regulations, two of which related to poultry

growers and live poultry dealers:  § 201.217 (poultry grower must have a reasonable amount of

time to cure a breach of contract) and § 201.218 (poultry grower can decline arbitration).

     In addition to regulations that have been passed, the USDA currently has proposed

regulations still under consideration that are useful for this Court's analysis.  With regards to the

tournament system, the proposed regulations indicate that "if not corrected, [the system] create[s]

a reasonable likelihood of competitive injury."  Implementation of Regulations Required Under

Title XI of the Food, Conservation and Energy Act of 2008; Conduct in Violation of the Act, 75

Fed. Reg. 119, at 35343-4 (June 22, 2010).  *Federal Register: The Daily Journal of the United*

*States*.  (Attached as Exhibit 5).  The tournament system goes to the very heart of this case,

where M&M alleges that Defendant is depressing artificially its payout to M&M and impairing

its ability to compete with other growers.  The preamble to the proposed regulations states that:

> a likelihood of competitive injury "also occurs when a packer, swine
> contractor, or live poultry dealer wrongfully depresses prices paid to a
> producer or grower below market value or impairs the producer or
> grower's ability to compete with other producers or growers or to a
> impair a producer's or grower's ability to receive the reasonable
> expected full economic value from a transaction in the market channel or
> marketplace.  To establish an actual or likely competitive injury, it is not

19

> necessary to show that a challenged act or practice had a likely effect on resale price levels."

75 Fed. Reg. 119, at 35341.

Furthermore, in adjudicating § 192 claims against packers and swine contractors, the very same section that applies to live poultry dealers, USDA has "consistently taken the position that in order to prove that any practice is unfair under . . . 7 U.S.C. § 192 (a) . . . it is not necessary to prove predatory intent, competitive injury, or likelihood of injury and that it is the Department's duty to stop unlawful practices in their incipiency prior to actual injury." *In re Ozark County Cattle Co*., 49 Agric. Dec. 336, 365 (1990) (internal quotations omitted). In addition, the USDA held that § 192 should be read liberally in order to reach types of conduct that are deemed unfair under Section 45 of the FTC Act as well as conduct that could injure poultry farmers. *In re Walti, Schilling Co*., 39 Agric. Dec. 119 (1978). The USDA's position that the PSA prohibits all unfair practices, regardless of whether a practice causes a competitive injury should be given deference.[23]

Accordingly, the USDA's interpretation of § 192 should be given deference even when applied to poultry dealers, as any other course would result in the exact same statutory language in § 192(a) meaning one thing applied to a packer and another when applied to a live poultry dealer.[24]

### E.  Plaintiff's Complaint Contains Sufficient Allegations to Prove Likelihood of Competitive Injury.

---

[23] The case law supports the USDA's position that actual anticompetitive injury is not necessary to find liability under the PSA. *IBP,* 187 F.3d at 977 ("a practice which is likely to reduce competition and prices paid to farmers for cattle can be found an unfair practice under the Act") (quoting *Farrow* at 214).
[24] Indeed, the principles of statutory interpretation require that "identical terms within an Act are presumed to bear the same meaning." *Wheeler v. Newport News Shipbuilding*, 637 F.3d 280 (4th Cir. 2011) (quoting *Estate of Coward v. Nicklos Drilling Co.,* 505 U.S. 469, 479 (1992)).

If this Court is inclined to accept that some antitrust principles must be pled in order to maintain an action under §192 (a) and (b), Plaintiff's Complaint contains sufficient allegations to prove that Defendant's conduct is "likely" to result in competitive harm.  Plaintiff alleged that:

- Defendant is vertically integrated;

- Defendant controls every step of the chicken growing process as well as all control in providing the chicks, feed, and requirements;

- Defendant has monopsony power in the local area and that M&M has no other alternatives;

- Defendant has the power to depress prices paid to the grower; and

- Defendant does not pass on the cost savings to consumers so it is artificially keeping the prices high.

Am. Compl. at ¶¶ 8, 11, 16-18, and 44.

In situations like this one where the poultry market is vertically integrated and the grower alleges that Defendant is the only integrator in the area and the grower has no other alternatives so that the grower must sell to a single purchaser, the integrator likely has monopsony power in the relevant geographic market.  *Been*, 495 F.3d at 1231; Am. Compl. ¶ 11.  If the integrator such as Defendant has monopsony power over the grower with the ability to control the supply of chicks and depress M&M's or the grower's payout and resell without having to lower its own prices to the consumer, courts found that a plaintiff sufficiently alleged a likelihood of competitive injury because there was an adverse effect on the growers and the consumers.  *Been,* 495 F.3d at 1231-32 (Tenth Circuit held that growers "need only prove that specific practices have the *effect* of injuring competition or likely to do so.") (emphasis in original).

The Tenth Circuit provided its rationale for its opinion as follows: the "primary purpose of [the PSA] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry" and "to safeguard farmers . . . against receiving less than the true

21

market value of their livestock." *Id.* at 1232 (citing H.R.Rep. No. 85-1048, at 1, 1958 U.S.C.C.A.N. at 5213). Moreover, the 10th Circuit explained that the "chief evil" Congress feared was the monopolistic practices of the packers, "enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Been*, 495 F.3d at 1228 (quoting *Stafford,* 258 U.S. at 514-15).

Because Plaintiff alleged that Defendant has monopsony power, Defendant controls the supply of chicks, M&M had no other alternatives to sell chicks in the area, and Defendant can and does depress the prices it pays to M&M and other growers without having to lower its own prices to consumers, Plaintiff sufficiently alleged that Defendant's conduct is likely to harm competition. (Am. Compl. ¶¶ 11-19). Defendant's abuse of this power is made clear by the fact that Plaintiff was told by Defendant's representative that he would always be on the bottom of the tournament system no matter what he did. (*Id.* at ¶ 18).

## II.  PLAINTIFF PROPERLY ALLEGED A BREACH OF CONTRACT CLAIM UNDER WEST VIRGINIA LAW. (COUNT II)

To establish a claim for breach of contract under West Virginia law, the elements are: (1) that a valid, enforceable contract exists; (2) that the plaintiff performed under the contract; (3) that the defendant breached or violated its duties or obligations under the contract; and (4) that the plaintiff was injured as a result of a breach. *See Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 714 (S.D.W. Va. 2009) (stating the four elements to establish a breach of contract); *see also Wittenberg v. Wells Fargo Bank, N.A.*, 852 F. Supp. 2d 731, 749 (N.D.W.Va. 2012).

In the present case, Defendant violated the terms of the BPA by failing to give 90 days notice as required by Section D of the Agreement. (Am. Compl. at ¶ 29). In fact, by letter dated May 28, 2014, Defendant informed Plaintiff that he had 30 days to provide a "plan of action" to

pay for future utility bills.  Defendant had no authority under the BPA to insist upon such a "plan of action," nor did Defendant provide Plaintiff with a meaningful opportunity to comply with such a vague requirement.  Furthermore, Defendant's steadfast refusal to deliver flocks to Plaintiff from the May 28, 2014 notice set forth in the termination letter is immediate constructive termination and is in violation of the Packers and Stockyards Act, and the intent of the Grain Inspection, Packers and Stockyards Administration ("GIPSA") Rules and Regulations, and is therefore a *per se* violation of the Contract.

In 2011, one year before the present BPA was signed, GIPSA rules and regulations extended a minimum termination notice period to 90 days.  7 C.F.R §201.100(h).  The Rules also state that flocks cannot be suspended without 90 days notice.  *Id.* at §201.215.  The intent and purpose of that change in the law was to allow growers to continue to receive flocks so that their farms would not go into default and be foreclosed, in theory giving the grower and the processor time to attempt to resolve disputes without foreclosure becoming inevitable.  In the present case, Defendant left the Plaintiff with no means of paying the utility bills that it purported to be so concerned about.

Defendant's additional breaches of the BPA include, but are not limited to:  breaching its obligation to exert its best efforts in the process of growing chickens pursuant to paragraph H.1 (Am. Compl. at ¶ 21); breaching its obligation to provide Plaintiff with chicks "without bias in their pursuant to paragraph F.1 (*Id*)*;* and breaching its obligation to be responsible for damage caused to Plaintiff's property pursuant to paragraph F.5. (*Id*. at ¶ 37).

### III.  PLAINTIFF PROPERLY ALLEGED A CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING UNDER WEST VIRGINIA LAW. (COUNT III)

In West Virginia, a covenant of good faith and fair dealing is implied in every contract for the purpose of evaluating a party's performance of that contract.  *Spoor v. PHH Mortg. Corp.*, 2011 WL 883666 (N.D.W.Va. 2011); *Knapp v. American General Finance, Inc.*, 111 F. Supp. 2d 758, 767 (S.D. W. Va. 2000); *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289, 1290-91 (S.D. W. Va. 1986).  While Defendant correctly states that West Virginia law does not recognize an independent cause of action for a breach of duty of good faith and fair dealing separate and apart from a breach of contract claim, (*see Stand Energy Corp. v. Columbia Gas Transmission Corp.,* 373 F. Supp. 2d 631, 644 (S.D.W.Va. 2005); *Highmark West Virginia Inc. v. Jamie*, 655 S.E.2d 509, 514 (W.Va. 2007)), in the present case, Defendant is guilty of breach of the BPA in multiple respects as articulated in detail above.  Furthermore, Defendant abused the one-sided nature of the BPA, and its position as the only processor with whom Plaintiff was able to do business, and forced upon Plaintiff arbitrary and unfair requirements, not required by the BPA nor even by reasonable business considerations to harass and encumber Plaintiff under financial burdens making it impossible for him to reasonable refuse their unlawful demands.  (Am. Compl. at ¶¶ 35-37).  It was not enough for Defendant to deny Plaintiff its rights and benefits under the BPA, but Defendant also affirmatively sought to ruin Plaintiff as an example to any other growers in the Moorefield region who also have reason to complain about Defendant's bad faith practices.

## IV. PLAINTIFF PROPERLY ALLEGED A CLAIM OF TORTIOUS INTERFERENCE WITH CONTRACT UNDER WEST VIRGINIA LAW. (COUNT IV)

Under West Virginia law, "to establish *prima facie* proof of tortious interference, a plaintiff must show:  (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that

the interference caused the harm sustained; and (4) damages." Syl. Pt. 2, *Torbett v Wheeling Dollar Savings & Trust Co.,* 314 S.E.2d 166, 173 (W. Va. 1983).

In the present case, Plaintiff properly alleged all of the elements of this claim.  Plaintiff had a loan contract with Grant County Bank to which Defendant was not a party.  (Am. Compl. at ¶52). Defendant intentionally interfered with this contract by "forcing plaintiff to allow unfettered communication and access with the bank and forcing M&M to obtain advances from the bank for the purpose of paying utilities.  *Id.*  Defendant took these actions to diminish Plaintiff's status with the bank, intentionally creating an impression that Plaintiff was serially delinquent in paying his utilities, an impression that Defendant knew for a fact to be untrue.  *Id.* These actions caused Grant County Bank to make unnecessary advances, purportedly to pay for utilities, and added additional expense to the loan contract, and also led directly to David Mongold's bankruptcy and the default of the loan contract between Plaintiff and Grant County Bank. *Id.*  Defendant's conduct was completely unjustified, as it was for the sole purpose of exerting additional financial pressure on Plaintiff, so as to further its intention to terminate Plaintiff.

## CONCLUSION

For the reasons stated above, Plaintiff respectfully requests this Court to deny Defendant's Motion to Dismiss in its entirety and order this case to proceed to discovery.

**Respectfully submitted this 24th day of July, 2015.**

By: _____/s/ Keith Lively_____
**KEITH LIVELY (WV Bar #8919)**
**DOYLE, BARLOW & MAZARD PLLC**
**1110 Vermont Ave., N.W., Suite 715**
**Washington, DC  20005**
**202.589.1834 (tel)**
**202.589.1819 (fax)**

25

klively@dbmlawgroup.com

**J. DUDLEY BUTLER (MS Bar #7626)**
**BUTLER FARM & RANCH LAW GROUP, PLLC**
***Admitted Pro Hac Vice***
**499-A Breakwater Dr.**
**Benton, MS  39039**
**(662) 673-0091 (tel)**
**(662) 673-0091 (fax)**
**jdb@farmandranchlaw.com**

**TODD JOHNSON (WV Bar #9261)**
**JOHNSON LAW, PLLC**
**PO Box 519**
**Morgantown, WV 26507**
**(304) 292-7933 (tel)**
**(304) 292-7931 (fax)**
**todd@jlawpllc.com**

*ATTORNEYS FOR PLAINTIFF*
*M & M POULTRY, INC.*

26

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of July, 2015, I electronically filed the foregoing *Plaintiff's Opposition to Defendant's Motion to Dismiss* with the Clerk of the Court using the CM/ECF system, and by the same means served the following parties:

Peter G. Zurbuch (WV Bar #5765)
BUSCH, ZURBUCH & THOMPSON, PLLC
P.O. Box 1819
Elkins, WV 26241
Tel: (304) 636-3560
Fax: (304) 636-2290
Email: pzurbuch@bztlaw.com

Clayton E. Bailey (*Admitted Pro Hac Vice*)
BAILEY BRAUER PLLC
Campbell Centre I
8350 N. Central Expressway, Suite 206
Dallas, Texas 75206
Tel: (214) 360-7433
Fax: (214) 360-7435
Email: cbailey@baileybrauer.com


By:   _____/s/ Keith Lively_____
Keith Lively (WV Bar #8919)
DOYLE, BARLOW & MAZARD PLLC
1110 Vermont Ave., N.W., Suite 715
Washington, DC  20005
202.589.1834 (tel)
202.589.1819 (fax)
klively@dbmlawgroup.com